**Raymond Anthony SMITH, as Administrator of the Estate of George Eric Smith, deceased; and Katherine Soulas, in her own right, on behalf of her minor children, and as Executrix of the Estate of Timothy Soulas, deceased Plaintiffs,**

v.

**FEDERAL RESERVE BANK OF NEW YORK and Honorable John W. Snow, Secretary of the Treasury, Defendants.**

No. 03 CIV. 5658(HB).

United States District Court, S.D. New York.

Sept. 11, 2003.

---

***OPINION & ORDER***

BAER, District Judge.

Plaintiffs move to enjoin the disbursement of funds in an account administered by the Secretary of the Treasury from which plaintiffs seek to satisfy a judgment they obtained. Defendants cross-move for summary judgment. The law gives the Court little choice in how it must decide this matter, and the timing of the decision, dictated by the exigencies of the litigation, is even more unfortunate. For the following reasons, plaintiffs' motion is DENIED and defendants' cross-motion is GRANTED.

## I. INTRODUCTION

### A. Background

Plaintiff Raymond Anthony Smith is the half-brother and the administrator of the estate of George Eric Smith, who was killed in the World Trade Center on September 11, 2001. Plaintiff Katherine Soulas is the wife and the executrix of the estate of Timothy Soulas, who was also killed in that tragedy. Raymond Anthony Smith and Katherine Soulas (collectively "plaintiffs") brought suit against several parties, including the Republic of Iraq pursuant to Section § 1605 of the Foreign Sovereign Immunities Act ("FSIA"). *See Smith ex rel. Smith v. Islamic Emirate of Afghanistan,* 262 F.Supp.2d 217, 226 (S.D.N.Y.2003). On May 7, 2003, this Court concluded that Iraq was liable to the plaintiffs for damages of $63,504,063.19. *See id.* at 240–41. Judgment was entered on May 23, 2003.

On July 30, 2003, plaintiffs instituted the instant lawsuit in which they seek a declaratory judgment that they are entitled to and may attach certain assets of the former Republic of Iraq that were frozen by the United States at the start of the first Gulf War in 1990 and that are currently held in a "Special Purposes Account" by the Federal Reserve Bank of New York ("FRBNY"). On the basis that the U.S. Government contends that it intended imminently to transfer those funds to Iraq for reconstruction purposes, plaintiffs moved by order to show cause on July 30, 2003 for a temporary restraining order and a preliminary injunction to prevent the FRBNY from transferring funds out of this account.[1] A hearing on the prelimi-

---

**1.** Plaintiffs also served a writ of execution on the U.S. Marshal to be served on the Federal Reserve Bank. The U.S. Marshal, apparently on instructions from the Department of Jus-

nary injunction came on before Judge Daniels on August 5, 2003. Judge Daniels denied the preliminary injunction without prejudice and permitted plaintiffs to further develop the record and to renew their motion before me,[2] which plaintiffs did. The parties submitted new briefs and this Court heard oral argument on September 3, 2003.

## B. Standard for a preliminary injunction

Plaintiffs are entitled to a preliminary injunction if they show 1) a likelihood that they will suffer irreparable harm if an injunction does not issue, and 2) either a) likelihood of success on the merits or b) sufficient serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in their favor. *See, e.g., Federal Exp. Corp. v. Federal Espresso, Inc.,* 201 F.3d 168, 173 (2d Cir.2000). In their briefs and at the hearing, the parties largely presumed the likelihood-of-irreparable-harm prong. Although preliminary injunctions are generally denied when only monetary damages are at stake, this case presents an exceptional situation where plaintiffs face a likelihood of irreparable harm if an injunction does not issue. If the funds from this Special Purpose Account are disbursed to Iraq, plaintiffs may be deprived of their sole available source for satisfying their judgment. Instead, the parties primarily dispute the merits of the matter. At the oral argument on September 3, 2003, the parties agreed that this matter was ripe for a final resolution on the merits, as the dispute solely concerns statutory and constitutional interpretation. *See* Fed.R.Civ.P. 65(a)(2) ("Before or after the commencement of the hearing of an application for a preliminary injunction, the court may order the trial of the action on the merits to be advanced and consolidated with the hearing of the application.").

## II. DISCUSSION

Plaintiffs contend that they are entitled to satisfy their judgment from the funds in this Special Purpose Account pursuant to the Terrorism Risk Insurance Act ("TRIA"), which Congress enacted in November 2002 and which permits persons holding compensatory awards against a "terrorist party" to satisfy their claims from the "blocked assets" of the terrorist party. Defendants contend that each of two independent actions taken by President Bush placed the assets of the Special Purpose Account beyond the reach of the TRIA and too beyond the reach of these plaintiffs.[3] Thus, the resolution of this

---

tice without any inquiry or discussion with the Court, a practice with which I am unfamiliar, was instructed not to serve this writ on the FRBNY, apparently on sovereign immunity grounds. Although the writ has still not been served on the FRBNY, the defendants have agreed to leave in the account sufficient funds to cover plaintiffs' judgment at least until the 15th of the month. Accordingly, all but $63.9 million of the approximately $1.9 billion originally placed in the Special Purpose Account has already been sent to Iraq. *See* Tr. 25.

2. Judge Daniels denied plaintiffs' preliminary injunction because, in his view, plaintiffs failed to demonstrate irreparable harm or a likelihood of success on the merits. Judge Daniels also stated that plaintiff had not shown that President Bush acted beyond his powers.

3. Plaintiffs also contend they are entitled to the money pursuant to the Foreign Sovereign Immunities Act, which provides

any property with respect to which financial transactions are prohibited or regulated pursuant to section 5(b) of the Trading with the Enemy Act (50 U.S.C.App. 5(b)), section 620(a) of the Foreign Assistance Act of 1961 (22 U.S.C. 2370(a)), sections 202 and 203 of the International Emergency Economic

matter requires an analysis of the TRIA as well as the executive actions taken by President Bush and the statutes upon which those actions were taken.

## A. The Terrorism Risk Insurance Act

Section 201(a) of the TRIA provides:

Notwithstanding any other provision of law, and except as provided in subsection (b), in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605(a)(7) of title 28, United States Code, the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

Pub.L. No. 107-297, § 201(a), 116 Stat. 2322, 2337 (Nov. 26, 2002). There is no dispute that Iraq is a "terrorist party" or that its assets in the accounts frozen by the United States in 1990 are "blocked assets" within the meaning of the TRIA. The TRIA defines the term "terrorist party" to include "a foreign state designated as a state sponsor of terrorism under section 6(j) of the Export Administration Act of 1979 (50 U.S.C.App. 2405(j)) or section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. 2371)." *Id.* § 201(d)(4), 116 Stat. at 2340. Because Iraq has been designated by the United States as a state sponsor of terrorism since 1990, it falls within the TRIA's definition of "terrorist party." The TRIA defines "blocked asset" to include "any asset seized or frozen by the United States under section 5(b) of the Trading With the Enemy Act (50 U.S.C.App. 5(b)) or under sections 202 and 203 of the International Emergency Economic Powers Act (50 U.S.C. 1701; 1702)." *Id.* § 201(d)(2), 116 Stat. at 2340. Following Iraq's invasion of Kuwait in 1990, the United States blocked certain Iraqi accounts located in the United States pursuant to, *inter alia*, the International Emergency Economic Powers Act, *see* Exec. Order No. 12722, 55 Fed.Reg. 31803 (Aug. 2, 1990).[4]

Powers Act (50 U.S.C. 1701–1702), or any other proclamation, order, regulation, or license issued pursuant thereto, shall be subject to execution or attachment in aid of execution of any judgment relating to a claim for which a foreign state (including any agency or instrumentality of such state) claiming such property is not immune under section 1605(a)(7).

28 U.S.C. § 1610(f)(1)(A). However, after a court invalidated President Clinton's waiver of this abrogation of sovereign immunity, *see Alejandre v. AT & T*, 42 F.Supp.2d 1317 (S.D.Fla.), *vacated on other grounds*, 183 F.3d 1277 (11th Cir.1999), Congress adopted legislation which empowered the President to waive any provision of § 1610(f)(1) if in the national interest. *See* Pub.L. No. 106–386, § 2002(f)(1), 114 Stat. 1543 (codified at 28 U.S.C. § 1610(f)(3)). President Clinton exercised this waiver of § 1610(f)(1). *See* Presidential Determination 2001–23 (Oct. 28, 2000), 65 Fed.Reg. 66483.

4. This Executive Order provided:

I, GEORGE BUSH, President of the United States of America, find that the policies and actions of the Government of Iraq constitute an unusual and extraordinary threat to the national security and foreign policy of the United States and hereby declare a national emergency to deal with that threat. I hereby order:

Section 1. All property and interests in property of the Government of Iraq, its agencies, instrumentalities and controlled entities and the Central Bank of Iraq that are in the United States, that hereafter come within the United States or that are or hereafter come within the possession or control of United States persons, including their overseas branches, are hereby blocked.

**B. Executive Order 13290 and the International Emergency Economic Powers Act**

▮ The defendants contend that those blocked assets that might otherwise have gone to compensate the plaintiffs have been placed beyond the TRIA by Executive Order 13290, which President Bush issued on March 20, 2003, the eve of the launch of Operation Iraqi Freedom. This Executive Order confiscated and vested in the United States the blocked assets of the Republic of Iraq. It provided:

I, GEORGE W. BUSH, President of the United States of America, hereby determine that the United States and Iraq are engaged in armed hostilities, that it is in the interest of the United States to confiscate certain property of the Government of Iraq and its agencies, instrumentalities, or controlled entities, and that all right, title, and interest in any property so confiscated should vest in the Department of the Treasury. I intend that such vested property should be used to assist the Iraqi people and to assist in the reconstruction of Iraq, and determine that such use would be in the interest of and for the benefit of the United States.

I hereby order:

Section 1. **All blocked funds held in the United States in accounts in the name of the Government of Iraq, the Central Bank of Iraq, Rafidain Bank, Rasheed Bank, or the State Organization for Marketing Oil are hereby confiscated and vested in the Department of the Treasury,** except for the following:

(a) any such funds that are subject to the Vienna Convention on Diplomatic Relations or the Vienna Convention on Consular Relations, or that enjoy equivalent privileges and immunities under the laws of the United States, and are or have been used for diplomatic or consular purposes, and

(b) any such amounts that as of the date of this order are subject to post-judgment writs of execution or attachment in aid of execution of judgments pursuant to section 201 of the Terrorism Risk Insurance Act of 2002 (Public Law 107 297), provided that, upon satisfaction of the judgments on which such writs are based, any remainder of such excepted amounts shall, by virtue of this order and without further action, be confiscated and vested.

Exec. Order No. 13290 (Mar. 20, 2003) (emphasis added). This measure was taken pursuant to the powers, *inter alia*, of the International Emergency Economic Powers Act ("IEEPA"). Significantly, Section 106 of the USA Patriot Act amended the IEEPA to empower the president to confiscate and vest in the United States the assets of foreign countries. *See* Pub.L. 107–56, 115 Stat. 271, 278 (Oct. 26, 2001) (codified at 50 U.S.C. § 1702(a)(1)(C)). This provision states:

[The president may] when the United States is engaged in armed hostilities or has been attacked by a foreign country or foreign nationals, confiscate any property, subject to the jurisdiction of the United States, of any foreign person, foreign organization, or foreign country that he determines has planned, authorized, aided, or engaged in such hostilities or attacks against the United States; and all right, title, and interest in any property so confiscated shall vest, when, as, and upon the terms directed by the President, in such agency or person as the President may designate from time to time, and upon such terms and conditions as the President may prescribe, such interest or property shall be held, used, administered, liquidated, sold, or otherwise dealt with in the interest of

and for the benefit of the United States, and such designated agency or person may perform any and all acts incident to the accomplishment or furtherance of these purposes.

50 U.S.C. § 1702(a)(1)(C). As is plain to see, the President in issuing Executive Order 13290 borrowed heavily from the language of the USA Patriot Act, which expressly empowered him to confiscate and vest in the United States assets in the United States of foreign nations that are at war with the United States.

As a consequence, defendants contend that the assets contained in the previously blocked Iraqi accounts ceased to be "blocked assets" of Iraq and were no longer within the reach of the TRIA—and, perhaps more importantly, the Executive Order shielded these assets from plaintiffs' suit by the sovereign immunity of the United States. Plaintiffs counter that the phrase "notwithstanding any other provision of law" in the TRIA trumps the IEEPA and the USA Patriot Act. In addition, plaintiffs contend that Congress appropriated these funds for the compensation of victims of terrorism with judgments against the perpetrators and that President Bush exceeded his power when he purported to reappropriate these funds for a purpose not designated by Congress.

With respect to the phrase "notwithstanding any other provision of law" in the TRIA and that language trumping the IEEPA, plaintiffs rely on *Hill v. Republic of Iraq*, 2003 WL 21057173 (D.D.C. Mar. 11, 2003), in which Judge Thomas Penfield Jackson noted that "the phrase 'notwithstanding any other provision of law,' or a variation thereof, means exactly that; it is unambiguous and effectively supersedes all

previous laws." *Hill*, 2003 WL 21057173, at *2 (quoting *Energy Transp. Group, Inc. v. Skinner*, 752 F.Supp. 1, 10 (D.D.C. 1990)). In *Hill*, a group of plaintiffs enforced a judgment against Iraq, pursuant to the TRIA, from several bank accounts in the name of the Embassy of Iraq Commercial Office which had been blocked since 1992. *See id.* at *1. In that opinion, Judge Jackson considered whether those accounts were immune from execution under the Vienna Convention on Diplomatic Relations or the Foreign Sovereign Immunities Act ("FSIA"). *See id.* at *1. Judge Jackson ruled that the "notwithstanding" phrase of the TRIA "by its plain terms ... overrides any immunity from execution that blocked Iraqi property might otherwise enjoy under the Vienna Convention or the FSIA." *Id.* at *2.[5] Although the "notwithstanding" language Congress used in the TRIA was broad, it necessarily has a scope and that scope depends on the substance of the provision to which it is attached. The substance of Section 201(a) is that "the blocked assets of that terrorist party ... shall be subject to execution or attachment" to pay the terrorist party's liability for compensatory damages. The phrase "notwithstanding any other provision of law" simply means that Section 201(a) controls if there is another provision of law that conflicts with it. As Judge Jackson found, to the extent that a foreign country's sovereign immunity potentially conflicts with Section 201(a), the "notwithstanding" phrase removes the potential conflict. It does not mean, as plaintiffs urge, that the TRIA covers the entire field and nullifies all previous statutes that pertain to blocked assets. Unlike in *Hill*, the TRIA and the relevant provision of the

---

**5.** Judge Jackson rendered this decision in *Hill* on March 11, 2003, approximately one week before the President issued Executive Order 13290, which vested in the United States

Iraq's blocked assets. Thus, he did not have the opportunity to evaluate the breadth of this "notwithstanding" phrase—*i.e.*, whether it operated to nullify the IEEPA.

IEEPA coexist with no conflict, and thus the "notwithstanding" phrase in the TRIA does not require that the powers granted the President by the IEEPA be nullified. The IEEPA, as amended by the USA Patriot Act, authorizes the President to confiscate the assets in the United States of foreign countries or foreign nationals who are engaged in armed conflict with the United States.[6]

Because plaintiffs' statutory-interpretation argument fails, it is necessary to consider their argument that the President exceeded his power. As noted above, this argument hinges largely on the view that the TRIA is an appropriations measure. Under this view, the assets in the Special Purposes Account remain subject to TRIA because Congress "appropriated" these funds for the compensation of victims of terrorism and that President Bush's reappropriation for another purpose not designated or agreed to by Congress was in violation of the Appropriations Clause, Art. I, § 9, cl. 7,[7] of the U.S. Constitution, which grants to Congress the exclusive power of the purse. *See Cincinnati Soap Co. v. U.S.*, 301 U.S. 308, 321, 57 S.Ct. 764, 81 L.Ed. 1122 (1937) (The Appropriations Clause "means simply that no money can be paid out of the Treasury unless it has been appropriated by an act of Congress."). However, plaintiff's interpretation of the TRIA as an appropriation bears a fundamental flaw. The TRIA by its plain terms does not direct that funds collected by the U.S. Treasury be spent by a particular agency for a particular purpose. Instead, the TRIA declares that blocked assets of foreign parties "shall be subject to execution or attachment"—i.e., the assets of *foreign parties* held in the United States *may* be used to satisfy these judgments.[8] "The [Supreme] Court has previously recognized that the congressional purpose in authorizing blocking orders is 'to put control of foreign assets in the hands of the President ....' Such orders permit the President to maintain the foreign assets at his disposal for use in negotiating the resolution of a declared national emergency." *Dames & Moore v. Regan*, 453 U.S. 654, 673, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981) (citation omitted). Indeed, the Executive Order at issue here is strikingly similar to the executive actions discussed in *Dames & Moore*, where the Supreme Court upheld executive orders that implemented an agreement with Iran for the release of American hostages. The challenged actions in *Dames & Moore* involved 1) the nullification of attachments against Iranian assets and the ordered transfer of Iranian assets to the Federal Reserve Bank pursuant to IEEPA, and 2) the suspension of claims against Iran in U.S. courts. With respect to the actions taken by Presidents Carter and Reagan pursuant to the IEEPA, the Court noted, "When the President acts pursuant to an

---

**6.** Ironically, plaintiffs argue elsewhere that a general provision cannot override a specific statute. This rule seems applicable here to deprive the "notwithstanding" phrase of the very broad reach that plaintiffs urge, namely to nullify the USA Patriot Act's amendment of the IEEPA.

**7.** This clause provides: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law; and a regular Statement and Account of the Receipts and Expenditures of all public Money shall be published from time to time." Art. I, § 9, cl. 7.

**8.** Moreover, the TRIA did not automatically, as plaintiffs would have it, create for them a property interest in those blocked Iraqi assets merely because they had a case pending against Iraq. Any property interest or right to those funds arose only upon entry of a judgment, which plaintiffs obtained several months after the blocked Iraqi assets were converted to U.S. assets subject to the President's discretion.

express or implied authorization from Congress, he exercises not only his powers but also those delegated by Congress. In such a case the executive action 'would be supported by the strongest of presumptions and the widest latitude of judicial interpretation, and the burden of persuasion would rest heavily upon any who might attack it.'" *Dames & Moore*, 453 U.S. at 668, 101 S.Ct. 2972 (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637, 72 S.Ct. 863, 96 L.Ed. 1153 (1952)). Similar to President Bush's action here, President Carter issued an executive order that required banks holding frozen Iranian assets to transfer these assets to the Federal Reserve Bank of New York to be held at the discretion of the Secretary of the Treasury. *See id.* at 665–66, 101 S.Ct. 2972. Although the Court acknowledged that the IEEPA does not expressly grant the power to vest or take title to the blocked assets of a foreign country, *see id.* at 673 n. 5, 101 S.Ct. 2972, the Court found President Carter's actions authorized by the "broad authority of the Executive when acting under this congressional grant of power." *Id.* at 672, 101 S.Ct. 2972. Thus, President Bush's action, which was based on the explicit authorization from the USA Patriot Act to take title to these assets, was supported by the strongest presumption, which plaintiffs fail to rebut.

Plaintiffs also rely on *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952), in which the Supreme Court held that President Truman's Executive Order that directed the Secretary of Commerce to take possession and operate the country's steel mills to avert a labor strike that potentially jeopardized the supply of munitions and thus the national defense was unconstitutional. *See Youngstown Sheet & Tube*, 343 U.S. at 587–88, 72 S.Ct. 863. However, *Youngstown Sheet & Tube* is distinguishable. First, unlike President Truman, whose seizure of the steel mills was not authorized by statute,[9] President Bush issued Executive Order 13290 (and, as discussed below, Presidential Determination 2003–23) pursuant to express congressional authorization. Second, although President Truman's seizure of the steel mills had an impact on foreign policy and the conduct of the war in Korea, it was clearly an act that primarily related to domestic affairs—*i.e.*, it involved the intervention into a domestic labor dispute and the seizure of private U.S. property. As defendants note, the issue with respect to the extent of the President's control over the blocked assets of a foreign state was decided in *Dames & Moore*—these are matters that involve foreign affairs.

Because I disagree with plaintiffs' characterization of TRIA as an appropriations bill and because it is clear that the powers granted to the president by the IEEPA were not extinguished by the TRIA's "notwithstanding" phrase, I find that the blocked assets of the former Republic of Iraq became assets of the United States as of President Bush's Executive Order of March 20, 2003. Thus, as of that date,

---

**9.** In fact, Congress had specifically rejected an amendment to the Labor Management Relations Act of 1947 (the Taft Hartley Act) which would have authorized such seizures in the case of emergency. *See id.* at 586, 72 S.Ct. 863. The Court reached the question of whether President Truman was acting within his constitutional authority after first concluding that there was no statutory authority for his action. *See id.* at 585, 597, 72 S.Ct. 863

("The President's power, if any, to issue the order must stem either from an act of Congress or from the Constitution itself. There is no statute that expressly authorizes the President to take possession of property as he did here.... It is clear that if the President had authority to issue the order he did, it must be found in some provisions of the Constitution.").

they ceased to be subject to exception or attachment pursuant to the TRIA and, as property of United States, became shielded by sovereign immunity.

## C. Presidential Determination 2003–23 and the Emergency Wartime Supplemental Appropriations Act

■ The second executive measure that places the assets in the Special Purpose Account beyond the reach of the TRIA is Presidential Determination No.2003–23, which President Bush issued pursuant to the Emergency Wartime Supplemental Appropriations Act ("EWSAA"). Section 1503 of the EWSAA, which Congress enacted on April 16, 2003, authorized the President to make inapplicable with respect to Iraq "section 620A of the Foreign Assistance Act of 1961 or *any other provision of law that applies to countries that have supported terrorism.*" Pub.L. 108–

11, 117 Stat. 559, 579 (Apr. 16, 2003) (emphasis added).[10] On May 7, 2003, approximately one week after the President declared the end of major combat in Iraq and two weeks before final judgment in plaintiffs' case against Iraq, President Bush exercised the power granted to him by section 1503 of EWSAA and issued Presidential Determination 2003–23 and "ma[d]e inapplicable with respect to Iraq section 620A of the Foreign Assistance Act of 1961 ... and any other provision of law that applies to countries that have supported terrorism." Although this Presidential Determination did not explicitly mention the TRIA, President Bush stated in a message to Congress on May 22, 2003 that Presidential Determination 2003–23 "made inapplicable with respect to Iraq section 620A of the Foreign Assistance Act of 1961 ... and any other provision of law that applies to countries that have supported terrorism. Such provisions of law

**10.** In its entirety, section 1503 provides:

The President may suspend the application of any provision of the Iraq Sanctions Act of 1990: *Provided,* That nothing in this section shall affect the applicability of the Iran–Iraq Arms Non–Proliferation Act of 1992 (Public Law 102–484), except that such Act shall not apply to humanitarian assistance and supplies: *Provided further,* That the President may make inapplicable with respect to Iraq section 620A of the Foreign Assistance Act of 1961 or any other provision of law that applies to countries that have supported terrorism: *Provided further,* That military equipment, as defined by title XVI, section 1608(1)(A) of Public Law 102–484, shall not be exported under the authority of this section: *Provided further,* That section 307 of the Foreign Assistance Act of 1961 shall not apply with respect to programs of international organizations for Iraq: *Provided further,* That provisions of law that direct the United States Government to vote against or oppose loans or other uses of funds, including for financial or technical assistance, in international financial institutions for Iraq shall not be construed as applying to Iraq: *Provided further,* That the President shall

submit a notification 5 days prior to exercising any of the authorities described in this section to the Committee on Appropriations of each House of the Congress, the Committee on Foreign Relations of the Senate, and the Committee on International Relations of the House of Representatives: *Provided further,* That not more than 60 days after enactment of this Act and every 90 days thereafter the President shall submit a report to the Committee on Appropriations of each House of the Congress, the Committee on Foreign Relations of the Senate, and the Committee on International Relations of the House of Representatives containing a summary of all licenses approved for export to Iraq of any item on the Commerce Control List contained in the Export Administration Regulations, 15 CFR Part 774, Supplement 1, including identification of end users of such items: *Provided further,* That the authorities contained in this section shall expire on September 30, 2004, or on the date of enactment of a subsequent Act authorizing assistance for Iraq and that specifically amends, repeals or otherwise makes inapplicable the authorities of this section, whichever occurs first.

that apply to countries that have supported terrorism include ... section 201 of the Terrorism Risk Insurance Act."

Defendants contend that as "a provision of law that applies to countries that have supported terrorism," the TRIA was made inapplicable to Iraq by Presidential Determination 2003–23. Because this Presidential Determination preceded the judgment that plaintiffs obtained, the TRIA does not provide a basis for plaintiffs to execute against the Special Purpose Account. Plaintiffs contend that Congress intended EWSAA to lift the sanctions against Iraq that prevented it from selling oil but not to permit the repeal of the TRIA. Plaintiffs also contend that if EWSAA authorized President Bush to make Section 201 of the TRIA inapplicable to Iraq, it was an impermissible line-item veto. Once again, neither of plaintiffs' contentions is persuasive.

Plaintiffs rely on the legislative history to show that EWSAA was intended mainly to apply to laws that imposed sanctions on the previous Iraqi regime. Even if true, the plain meaning of the language Congress chose to use is broad—"or any other provision of law that applies to countries that have supported terrorism"—and undeniably encompasses the TRIA, which was enacted five months before the EWSAA. *Cf. Dames & Moore*, 453 U.S. at 672, 101 S.Ct. 2972 (rejecting argument that legislative history revealed an intention contrary to the plain meaning of the statute). This is the same result reached in a very recent lawsuit that involved a group of plaintiffs seeking to satisfy a judgment against Iraq from the funds in this Special Purpose Account. Judge Rob-

erts in the District Court of D.C. initially granted a temporary restraining order; he subsequently vacated the temporary restraining order and entered summary judgment for the defendants based on the conclusion that Presidential Determination 2003–23 made the TRIA inapplicable to Iraq. *See Acree v. Snow*, 2003 WL 21754983 (D.D.C. July 30, 2003).[11]

Plaintiffs contend that Judge Roberts' decision in *Acree* is not dispositive because plaintiffs here raise issues that were not raised or decided there. In particular, plaintiffs here contend that Presidential Determination 2003–23 was an impermissible line-item veto of Section 201(a) of the TRIA and that the EWSAA improperly delegated legislative functions to the President, in violation of the Constitution's separation of powers. With respect to the first of these arguments, plaintiffs rely on *Clinton v. New York*, 524 U.S. 417, 118 S.Ct. 2091, 141 L.Ed.2d 393 (1998), in which the Supreme Court struck down the Line Item Veto Act as a violation of the Presentment Clause of the Constitution, Art. I, § 7. *See Clinton*, 524 U.S. at 421, 118 S.Ct. 2091. This argument is not without some merit. For example, in that case the Court stated, "There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Id.* at 438, 118 S.Ct. 2091. However, in *Clinton*, the Court recognized that other statutes that granted the president the power to suspend the operation of or repeal certain statutory provisions had been upheld. *See id.* at 444–45, 118 S.Ct. 2091.[12] A significant difference between those provisions and the Line Item Veto

11. The plaintiffs in *Acree v. Snow* were seventeen service members (and their close family members) who were tortured by Iraq while being held as prisoners of war during the Gulf War in 1991. *See Acree v. Republic of Iraq*, 271 F.Supp.2d 179 (D.D.C.2003).

12. However, the Court noted that these provisions had never been tested against the Presentment Clause. *See* 524 U.S. at 444 n. 36, 118 S.Ct. 2091.

Act was that they involved foreign affairs, where "the President has 'a degree of discretion and freedom from statutory restriction which would not be admissible were domestic affairs alone involved.'" *Id.* at 445, 118 S.Ct. 2091 (citing *United States v. Curtiss–Wright Export Corp.*, 299 U.S. 304, 320, 57 S.Ct. 216, 81 L.Ed. 255 (1936)). Furthermore, the *Clinton* Court found objectionable that "whenever the President cancels an item of new direct spending or a limited tax benefit he is rejecting the policy judgment made by Congress and relying on his own policy judgment." *Clinton*, 524 U.S. at 444, 118 S.Ct. 2091 (distinguishing *Field v. Clark*, 143 U.S. 649, 12 S.Ct. 495, 36 L.Ed. 294 (1892)). Unlike in *Clinton*, President Bush is carrying out, not rejecting, a policy made by Congress based on the drastically changed circumstances in Iraq.

With respect to plaintiffs' delegation-doctrine argument, plaintiffs quote statements from cases that discuss the basic separation-of-powers notion. However, this argument fails to appreciate that the Supreme Court has widely permitted the Congress to delegate its legislative authority to the other branches. *See Loving v. United States*, 517 U.S. 748, 771, 116 S.Ct. 1737, 135 L.Ed.2d 36 (1996) ("Though in 1935 we struck down two delegations for lack of an intelligible principle, *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935), and *Panama Refining Co. v. Ryan*, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935), we have since upheld, without exception, delegations under standards phrased in sweeping terms."); *Mistretta v. United States*, 488 U.S. 361 373, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989) ("After invalidating in 1935 two statutes as excessive delegations, we have upheld, again without deviation, Congress' ability to delegate power under broad standards." (citations omitted)). As the Court stated in *Mistret-*

*ta,* "our jurisprudence has been driven by a practical understanding that in our increasingly complex society, replete with ever changing and more technical problems, Congress simply cannot do its job absent an ability to delegate power under broad general directives." 488 U.S. at 372, 109 S.Ct. 647. Thus, to the extent that the EWSAA involves the delegation of legislative authority to the President—a questionable proposition given that this act related to foreign affairs—this delegation finds ample support under the Supreme Court's jurisprudence.

## III. CONCLUSION

These plaintiffs lost love ones in the catastrophe at the World Trade Center on September 11, 2001, yet they along with others, such as the prisoners of war tortured by the former Iraqi regime during the Gulf War in 1991, are being denied any recovery. The government contends that these funds, which might otherwise be used for compensation, are needed to rebuild Iraq. That need is clear, nonetheless one wonders whether American families who lost loved ones as a result of terrorism here and abroad ought not be compensated first. That said, compensation sought by plaintiffs, at least from this source, must be denied, and the defendants' cross-motion for summary judgment is GRANTED. The writ of execution which plaintiffs served on the U.S. Marshal to be served on the Federal Reserve Bank of New York is vacated.

**SO ORDERED.**