Susan WEINSTEIN, individually, as Co–Administrator of the Estate of Ira William Weinstein, and as natural guardian of plaintiff David Weinstein, et al., Plaintiffs,

v.

The ISLAMIC REPUBLIC OF IRAN, et al., Defendants.

The Bank of New York, Petitioner,

v.

Susan Weinstein, individually, as Co–Administrator of the Estate of Ira William Weinstein, and as natural guardian of plaintiff David Weinstein, et al., Respondents.

No. Misc.02–237.

United States District Court, E.D. New York.

Jan. 13, 2004.

Pillsbury Winthrop LLP by: Leo T. Crowley and Daniel Z. Mollin, Esqs., New York City, for Petitioner Bank of New York.

Westerman Ball Ederer Miller & Sharfstein, LLP by: Jeffrey A. Miller and Philip J. Campisi, Esqs., New York City, for Plaintiffs–Respondents.

Patterson Belnap Webb & Tyler LLP by: John D. Winter, Esq., New York City, for Respondent Bank Melli Iran.

Law Offices of Steven W. Kerekes by: Steven W. Kerekes, Esq., Beverly Hills, CA, for Respondent Bank Saderat Iran.

John D. Ashcroft, Attorney General of the United States, United States Department of Justice by: Anthony J. Coppolino, Esq., Senior Trial Counsel, Civil Division, Washington, DC, for United States.

## MEMORANDUM AND ORDER

WEXLER, District Judge.

Petitioner Bank of New York ("BNY") brings this matter for determination of the respective rights of respondents in certain bank accounts maintained by BNY belonging to three of the respondents—Bank Melli Iran ("Bank Melli"), Bank Saderat Iran ("Bank Saderat"), and Bank Sepah Iran ("Bank Sepah"), all of which are Ira-

nian banks (collectively, the "Banks"). The remaining respondents are the judgment plaintiffs in the underlying action—decedent Ira Weinstein's widow, children and the co-administrators of his estate (the "plaintiffs"). Plaintiffs assert that the assets in the Banks' BNY accounts are subject to attachment under the Terrorism Risk Insurance Act of 2002 ("TRIA") § 201 and available to satisfy plaintiffs' judgment in the underlying action against the defendants—the Islamic Republic of Iran ("Iran"), the Iranian Ministry of Information, and three senior Iranian officials (the "defendants"). The Banks argue that the assets in their BNY accounts are not subject to attachment under the TRIA.[1] The United States Department of Justice ("DOJ") submits a statement of interest in this matter, with a declaration from the director of the Office of Foreign Assets Control ("OFAC") of the United States Treasury Department ("Treasury Department"), asserting that the Banks' assets are not subject to attachment under the TRIA.

## I. BACKGROUND

For purposes of this motion, the relevant background can be summarized as follows.

---

1. Bank Sepah has not appeared in this matter. However, the parties provide no basis for distinguishing between the Banks. Accordingly, the Court will treat the Banks similarly for purposes of discussion.

2. Section 1605(a)(7) provides that
   a foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case ... in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources ... for such an act if such act or provision of material support is engaged in by an official, employee, or agent of such foreign state while acting within the scope

## A. The Underlying Action and Judgment

On February 25, 1996, United States citizen and New York native Ira Weinstein was severely injured in a suicide bombing by the Hamas terrorist organization in Jerusalem, Israel. On April 13, 1996, Ira Weinstein died from those injuries.

On October 27, 2000, plaintiffs filed a civil action for wrongful death and related torts in the United States District Court for the District of Columbia against defendants under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605(a)(7).[2] On February 6, 2002, the district court entered judgment in plaintiffs' favor, finding that defendants had provided tens of millions of dollars to Hamas for the execution of terrorist attacks and had trained Hamas terrorists in bombmaking and other related tactics, and holding defendants liable to plaintiffs for approximately $183.2 million, consisting of $33.2 million in compensatory damages and $150 million in punitive damages. See Weinstein v. Islamic Republic of Iran, 184 F.Supp.2d 13 (D.D.C.2002).

## B. The Restraining Notices

On October 10, 2002, plaintiffs registered and filed their judgment in this dis-

---

of his or her office, employment, or agency
. . . .

28 U.S.C. § 1605(a)(7).

This provision was designed to permit United States citizens to bring civil actions against specifically-designated foreign state sponsors of terrorism, including Iran. See, e.g., Sutherland v. Islamic Republic of Iran, 151 F.Supp.2d 27 (D.D.C.2001) (holding Iran liable for American kidnaped and tortured by Hizbollah); Eisenfeld v. Islamic Republic of Iran, 172 F.Supp.2d 1 (D.D.C.2000) (holding Iran liable for death of American students in bombing by Hamas); Flatow v. Islamic Republic of Iran 999 F.Supp. 1 (D.D.C.1998) (holding Iran liable for death of American student in bombing by Islamic Jihad).

trict and served an information subpoena with a restraining notice on BNY to aid in the enforcement of the judgment. The October restraining notice sought information about, and required BNY to restrain, the accounts of Iran and any instrumentality of Iran maintained at BNY. Pursuant to this notice, BNY identified and restrained three accounts, one held by each of the Banks. BNY notified the Banks of its action by letter and requested that they contact legal counsel.

The Banks purportedly threatened legal action against BNY if the restraints were not removed. In response, BNY released the restraints on the accounts. Plaintiffs contend they were never notified of the communications between BNY and the Banks, of the existence of the subject accounts, or of BNY's decision to lift the restraints without court order. In addition, plaintiffs assert that BNY never responded to plaintiffs' October 10 information subpoena.

On November 27, 2002, plaintiffs served a second information subpoena and restraining notice on BNY, following the November 26, 2002 passage of the TRIA, Pub.L. No. 107–297, § 201(a), 116 Stat. 2322 (Nov. 26, 2002). The restraining notice was similar in nature to the October restraining notice, differing only with respect to references to the TRIA. BNY again restrained the Banks' accounts and notified plaintiffs of its action, identifying the accounts and their balances as of December 3, 2002. In this respect, the account balances were approximately $203,500 for Bank Melli; $6,500 for Bank Saderat; and $19,000 for Bank Sepah. After correspondence between plaintiffs and BNY, plaintiffs served another information subpoena on BNY, and BNY provided a response indicating that the account balances as of December 13, 2002 were approximately $149,900 for Bank Melli;

$5,400 for Bank Saderat; and $12,100 for Bank Sepah. According to plaintiffs, BNY acknowledged that all balance decreases between December 3rd and December 13th would be replaced.

## C. The TRIA and Iranian Sanctions Programs

Section 201(a) of Title II of the TRIA provides:

> Notwithstanding any other provision of law, and except as provided in subsection (b), in every case in which a person has obtained a judgment against a terrorist party on a claim based on an act of terrorism, or for which a terrorist party is not immune under section 1605(a)(7) of title 28, United States Code, the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in the aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

TRIA § 201(a), 116 Stat. at 2337. The TRIA defines a "blocked asset" as "any asset seized or frozen by the United States under section 5(b) of the Trading With the Enemy Act (50 U.S.C.App. 5(b)) or under sections 202 and 203 of the International Emergency Economic Powers Act (50 U.S.C. 1701; 1702)." *Id.* § 201(d)(2)(A), 116 Stat. at 2339.

As for the referenced provision of the Trading With the Enemy Act, 50 U.S.C.App. § 5(b), the parties agree that it does not apply to Iran; therefore, it does not apply to this matter.

On the other hand, §§ 202 and 203 of the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701 and 1702, do apply to Iran. These sections grant the President of the United States,

*inter alia,* broad authority to regulate foreign assets in appropriate circumstances:

(a)(1) At the times and to the extent specified in section 1701 of this title, the President may, under such regulations as he may prescribe, by means of instructions, licenses, or otherwise—

(A) investigate, regulate, or prohibit—

(i) any transactions in foreign exchange,

(ii) transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or a national thereof,

(iii) the importing or exporting of currency or securities,

by any person, or with respect to any property, subject to the jurisdiction of the United States;

(B) investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States . . . .

50 U.S.C. § 1702(a)(1)(A), (B); *see also id.* § 1701(b) ("The authorities granted to the President by section 1702 of this title may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared for purposes of this chapter and may not be exercised for any other purpose.").

In 1979, President Carter exercised the authority granted in the IEEPA against Iran. In this respect, on November 14, 1979, President Carter issued Executive Order ("EO") 12170 pursuant to the authority provided in the IEEPA, 50 U.S.C. § 1701 *et seq.*, in response to Iran's seizure of the U.S. Embassy in Tehran, Iran and the resulting hostage crisis. In EO 12170, the President directed:

I hereby order blocked all property and interests in property of the Government of Iran, its instrumentalities and controlled entities and the Central Bank of Iran which are or become subject to the jurisdiction of the United States or which are in or come within the possession or control of persons subject to the jurisdiction of the United States.

EO 12170, 44 Fed.Reg. 65,729 (Nov. 14, 1979). The President also ordered the Secretary of the Treasury Department to carry out the provisions of the order. *Id.*

In response, the Treasury Department, through the OFAC, issued the Iranian Assets Control Regulations ("IACR"), 45 Fed.Reg. 24,432, (Apr. 9 1980), codified at 31 C.F.R. Part 535. IACR § 535.201, in particular, provides:

No property subject to the jurisdiction of the United States or which is in the possession of or control of persons subject to the jurisdiction of the United States in which on or after the effective date Iran has any interest of any nature whatsoever may be transferred, paid, exported, withdrawn or otherwise dealt in except as authorized.

31 C.F.R. § 535.201. According to the DOJ, approximately $12 billion in Iranian government bank deposits, gold, and other property were blocked pursuant to EO 12170. Declaration of R. Richard Newcomb, Director, OFAC ("Newcomb Decl.") ¶ 9.

In April 1980, the President issued EO 12205, which prohibited specified financial transactions and the sale, supply or transfer by persons subject to United States jurisdiction of certain items to Iran. *See* EO 12205, 45 Fed.Reg. 24099 (April 7, 1980) (amended by EO 12211, 45 Fed.Reg. 26685 (Apr. 17, 1980)).

On January 19, 1981, the United States and Iran, through the efforts of the government of Algeria, reached an agreement, commonly known as the Algiers Accords, ending the crisis. Under the Algiers Accords, the United States agreed, *inter alia,* to "restore the financial position of Iran, insofar as possible, to that which existed prior to November 14, 1979," and to "commit itself to ensure the mobility and free transfer of all Iranian assets within its jurisdiction." Declaration of the Government of the Democratic and Popular Republic of Algeria. Jan. 19, 1981, para. A (Newcomb Decl., Exh. C).

Pursuant to the Algiers Accords, most Iranian assets were unblocked. The Algiers Accords, several executive orders, and OFAC regulations directed the marshaling and transfer of the majority of once-blocked assets to Iran and to escrow accounts to facilitate settlement of claims involving Iran under a claims settlement process provided for in the Algiers Accords. Newcomb Decl. ¶ 12.[3] One of these executive orders was EO 12282, entitled "Revocation of Prohibitions Against Transactions Involving Iran." EO 12282, 46 Fed.Reg. 7925 (Jan. 19, 1981). EO 12282 explicitly revoked, *inter alia,* EO 12205 and EO 12211, but not EO 12170 nor IACR § 535.201, which the parties concede have never been expressly revoked or repealed. According to the DOJ, IACR § 535.201 remains in effect for two reasons: (1) some Iranian blocked property—primarily diplomatic and consular property—remains in the United States, subject to the blocking order and the IACR; and (2) the claims settlement process before the Iran–U.S. Claims Tribunal at The Hague, established under the Accords, has not been completed. Newcomb Decl. ¶ 13 & Exh. D (noting Treasury Department report to Congress that $23.2 million in blocked Iranian assets remain in United States, primarily diplomatic and consular property).

To implement EO 12282, the OFAC repealed certain provisions of the IACR and promulgated a "general license" authorizing transactions with Iran, codified at 31 C.F.R. § 535.579.[4] The general license provides:

(a) Transactions involving property in which Iran or an Iranian entity has an interest are authorized where:

(1) The property comes within the jurisdiction of the United States or into the control or possession of any person subject to the jurisdiction of the

---

**3.** For instance, EOs 12276 and 12277 directed establishment of the escrow accounts and transfer of blocked Iranian government assets to the escrow accounts. *See* EO 12276, 46 Fed.Reg. 7913 (Jan. 19, 1981) (entitled, "Direction Relating to Establishment of Escrow Accounts"); EO 12277, 46 Fed.Reg. 7915 (Jan. 19, 1981) (entitled, "Direction to Transfer Iranian Government Assets"); *see also* EO 12278, 46 Fed.Reg. 7917 (Jan. 19, 1981) (entitled, "Direction to Transfer Iranian Government Assets Overseas"); EO 12279, 46 Fed. Reg. 7919 (Jan. 19, 1981) (entitled, "Direction

to Transfer Iranian Government Assets Held by Domestic Banks"); EO 12280, 46 Fed.Reg. 7921 (Jan. 19, 1981) (entitled, "Direction to Transfer Iranian Government Financial Assets Held by Non–Banking Institutions").

**4.** OFAC defines a "general license" as "[a] regulatory provision authorizing certain transactions without the filing of an application with OFAC." U.S. Treasury Dep't, *Foreign Assets Control Regulations for the Financial Community,* at 4 (Dec. 27, 2002).

United States after January 19, 1981, or

(2) The interest in the property of Iran or an Iranian entity (e.g. exports consigned to Iran or an Iranian entity) arises after January 19, 1981.

31 C.F.R. § 535.579(a). According to the DOJ, transactions authorized by this general license were no longer subject to the blocking prohibition in IACR § 535.201. Indeed, § 535.502(c) provides that a "license authorizing a transaction otherwise prohibited under this part has the effect of removing a prohibition or prohibitions in Subpart B from the transaction." 31 C.F.R. § 535.502(c). Thus, the general license of § 535.579(a) removed the prohibition of § 535.201.

Beginning in October 1987, further sanctions programs were implemented regarding Iran. In this respect, on October 29, 1987, President Reagan issued EO 12613, pursuant to the International Security and Development Cooperation Act ("ISDCA"), 22 U.S.C. § 2349aa–9, and 3 U.S.C. Title 301, prohibiting Iranian imports, with certain exceptions. *See* EO 12613, 52 Fed. Reg. 41940 (Oct. 29, 1987). EO 12613 specifies that it was issued solely in response to conditions occurring after the conclusion of the Algiers Accords. EO 12613 § 5. Pursuant to EO 12613, on November 17, 1987, OFAC issued the Iranian Transaction Regulations ("ITR"), 31 C.F.R. pt. 560, 52 Fed.Reg. 44076 (Nov. 17, 1987). The ITR prohibited, *inter alia,* the importation of goods and services from Iran and the exportation, reexportation, and sale or supply of goods, technology or services to Iran. *See* 31 C.F.R. §§ 560.201; 560.204.

On March 15, 1995, President Clinton issued EO 12957, declaring a national emergency regarding actions and policies of Iran and imposing additional sanctions against Iran, invoking the authority of, *inter alia,* the IEEPA. *See* EO 12957, 60 Fed.Reg. 14615 (Mar. 15, 1995). EO 12957 prohibited, *inter alia,* the entry into or performance by a United States person of a contract that includes responsibility for the development of petroleum resources located in Iran or a contract for the financing of the development of petroleum resources located in Iran. *Id.* § 1.

Then, on May 6, 1995, President Clinton issued EO 12959, expanding the scope of the sanctions imposed in EO 12613 and EO 12957, invoking the authority of, *inter alia,* the IEEPA and the ISDCA. *See* EO 12959, 60 Fed.Reg. 24757 (May 6, 1995). EO 12959 specifies that the measures were taken solely in response to conditions occurring after the conclusion of the Algiers Accords. *Id.* § 7. EO 12959, prohibited, *inter alia,* new investment in Iran or property owned or controlled by the government of Iran; import, export, and reexport trade with Iran, the government of Iran, or any entity owned or controlled by the government of Iran; and financing or brokering transactions by a United States person relating to goods or services of Iranian origin or owned or controlled by the government of Iran. *Id.* § 1.

On August 19, 1997, President Clinton issued EO 13059 to clarify and consolidate the provisions of EOs 12613, 12957, and 12959, once again invoking the authority of, *inter alia,* the IEEPA and the ISDCA. *See* EO 13059, 62 Fed.Reg.44531 (Aug. 19, 1997). EO 13059 specifically indicated that the measures were taken solely in response to conditions occurring after the conclusion of the Algiers Accords. *Id.* § 9. Thereafter, the ITR were amended to reflect the broader prohibitions imposed by EOs 12613, 12957, 12959, and 13059, regarding Iran and affecting goods, technology, services and related financial transactions, and new investment. *See* 31 C.F.R. §§ 560.204–.208.

### D. *The Banks and their BNY Accounts*

As for the Banks and their BNY accounts, Bank Melli asserts that it is an Iranian corporation, founded in 1927 and organized under the banking laws of Iran. It claims to have more than 2,600 branches in Iran, as well as branches, representative offices and subsidiaries throughout the Middle East, Europe, Asia and New York. The government of Iran owns the stock of Bank Melli, although Bank Melli asserts that it is run and managed as an independent corporate entity by its board of directors, which appoints its officers and oversees its policies and affairs. Bank Melli has a chairman, who is also a managing director. The managing director and all but one of the other directors is appointed through a process culminating with the approval of Iran's "General Meeting of the Banks." Affidavit of Gholamreza Rahi ("Rahi Aff.") ¶ 7. Bank Melli further asserts that its activities consist primarily of loan and investment matters, letters of credit, credit collections, and payment order transactions. In the United States, however, Bank Melli claims to operate as a representative office under New York State banking law, performing only research about banking and financial issues, not commercial banking activities, such as accepting deposits and making loans. In this respect, Bank Melli asserts, its BNY account is "operated pursuant to a license issued by OFAC in 1996" and is "used to pay the operating expenses" of its representative office in New York. *Id.* ¶ 24 & Exh. K (copy of license). The specific license,[5] issued by OFAC under the authority of, *inter alia,* the IEEPA and the ISDCA, and signed by Director Newcomb on March 29, 1996, authorizes Bank Melli's representative office "to conduct activities related to research in the United States" and "to act as a liaison with United States holders of correspondent bank accounts." *Id.* Exh. K. The restrained funds were wire transferred into Bank Melli's account on November 25, 2002. *Id.* ¶ 25.

As for Bank Saderat, it submits materials from an earlier, unrelated federal court action in the Southern District of California, *Flatow v. Islamic Republic of Iran,* No. 99–MC–250, indicating that it is an Iranian corporation, founded in 1952 and organized under the banking laws of Iran. These materials indicate that, as of 1999, Bank Saderat had more than 3,000 branches in Iran, as well as branches in the Middle East, Europe and New York. The government of Iran owns the stock of Bank Saderat, although Bank Saderat asserts that its operations are governed by a board of directors, which appoints its officers and oversees its policies and affairs. Its managing director and other directors are appointed by the "General Assembly of Banks." Declaration of Mohammedreza Moghadasi, dated January 2000, ¶ 12 (*see* Letter Brief of Steven W. Kerekes, Counsel for Bank Saderat, Exh. E). Bank Saderat's activities purportedly consist primarily of loan and investment matters, letters of credit, credit collections, and payment order transactions. In the United States, however, Bank Saderat operates as a representative office under New York State banking law, meaning it does not provide any commercial banking activities, such as accepting deposits and making loans; rather, it provides information about Bank Saderat's international banking services. Prior to 1997, Bank Saderat purportedly had an agency license for the

---

5. OFAC defines a "specific license" as "[a] permit issued by OFAC on a case-by-case basis to a specific ... company allowing an activity that would otherwise be prohibited by the embargo or sanctions program." U.S. Treasury Dep't, *Foreign Assets Control Regulations for the Financial Community* at 4 (Dec. 27, 2002).

New York branch which allowed it to perform commercial banking functions. As for its BNY account, Bank Saderat's account is also maintained under a specific license issued to it by OFAC on March 29, 1996, similar to the specific license issued to Bank Melli. *See* Affidavit of Jeffrey A. Miller ("Miller Aff."), Exh. L.

As for Bank Sepah's BNY account, that account is also maintained under a specific license issued to it by OFAC on March 29, 1996, similar to the specific licenses issued to Bank Melli and Bank Saderat. *Id.*

According to the OFAC, the Banks are subject to the Iranian sanctions programs discussed above. As the OFAC explains—and the parties do not dispute—when the November 1979 blocking order was issued, "the Banks operated as 'agencies' of their Iranian-headquartered offices, providing services to other banks and businesses, primarily relating to trade transactions." Newcomb Decl. ¶ 25. After the 1979 blocking, OFAC "issued specific licenses to the Banks authorizing them to provide very limited services, relating mostly to the processing of remittances to Iranian students in the United States." *Id.* As a result, "[a]ccounts of the Banks that existed in the United States prior to January 19, 1981 were exempted by specific license from the marshaling and transfer directives set forth in the Algiers Accords, executive orders and OFAC regulations that otherwise would have applied." *Id.* Following the Algiers Accords on January 18, 1981, OFAC repealed certain provisions of the IACR and promulgated the "general license" codified at 31 C.F.R. § 535.579, which removed the prohibition of § 535.201. *Id.* ¶ 26 (citing 31 C.F.R. § 535.502(c), providing that a "license authorizing a transaction otherwise prohibited under this part has the effect of removing a prohibition or prohibitions in Subpart B from the transaction.").

Furthermore, the OFAC explains, after EOs 12957 and 12959 were issued in March and May 1995, respectively, as discussed above, the Banks' activities were subject to significant new restrictions. The OFAC notes that it has determined that the Banks are "owned or controlled by the Government of Iran," *id.* ¶ 28 & Exh. F (citing 31 C.F.R. Part 560, App. A), making them subject to the prohibitions of ITR §§ 560.201 and 560.204 regarding Iran and affecting goods, technology, services and related financial transactions, and new investment. *Id.* (citing 31 C.F.R. §§ 560.201; 560.204). Moreover, U.S. banks, such as BNY, that hold accounts in the name of Government of Iran-controlled entities, such as the Banks, purportedly "require specific licenses from OFAC to actively operate such accounts, as opposed to merely posting interest to them." *Id.* (citing §§ 560.517; 560.319; and 560.320).

The OFAC maintains that the Banks' assets in the BNY accounts are not "blocked assets" under the TRIA. As the OFAC explains:

[T]he funds held by U.S. institutions, here, [BNY], are not blocked, or frozen. Significantly, [the Banks] have a one-time right to close their accounts and receive a lump sum transfer of those funds. *See* 31 C.F.R. § 560.517(a)(3). By contrast, in a blocking regime, neither the account-holder nor the bank that is holding the blocked account has a general authorization, such as the general license set forth at section 560.517(a)(3), to transfer, or otherwise deal in, those assets.

The effect of the prohibitions in sections 560.201 and 560.204 was to place the Banks in a position where they could not conduct banking operations or receive goods or services, of any kind, from a U.S. person, although U.S. depository institutions were authorized to

maintain the Banks' accounts, and pay interest to them. See section 560.517(a)(3). However, on June 13, 1995, OFAC granted the Banks specific licenses allowing them to cover overhead expenses and fulfill obligations in existence on June 6, 1995 ("1995 licenses"). The Banks were authorized to deposit funds and receive wire transfers to specific operating accounts in order to fulfill obligations in existence on June 6, 1995, but were not otherwise authorized to engage in banking business after June 6, 1995. For example, they were not allowed to process student remittances.

The Banks were given until March, 1996 to complete transactions relating to obligations that pre-dated the imposition of a broad trade embargo in May–June 1995. In March, 1996, OFAC issued a further round of specific licenses to the Banks ("1996 license"). The 1996 licenses required the closing of accounts authorized by the 1995 licenses and allowed the Banks to open specified new accounts for payroll and overhead expenses. The licenses limited the activities which [the Banks] may engage, namely, they can conduct research and act as a liaison with United States holders of correspondent bank accounts. In effect, the Banks are permitted to maintain skeletal presence in the United States as "representative" offices. (They had expressed to OFAC their concern that, if forced to close operations entirely under the ITR. they would lose their licenses to operate under New York banking law).

Although it is possible that the accounts licensed in 1995 included accounts that had once been subject to the 1979 blocking order, any accounts that the Iranian banks established after January 19, 1981, or funds credited to their accounts after January 19, 1981, were not blocked. *See* 31 C.F.R. § 535.579.

That is, transactions relating to the Banks' accounts or funds regulated under the [ITR], 31 C.F.R. Part 560, but the accounts or funds are not seized or frozen. Indeed, as noted, the general license set forth at 31 C.F.R. § 560.517 authorizes the closure of the accounts at the request of the account party.

Newcomb Decl. ¶¶ 28–31 & Exhs. H and I (citations and paragraph numbers omitted). .

## II. *DISCUSSION*

The parties urge the Court to determine, on the record presented, whether the TRIA allows plaintiffs to enforce their judgment against the assets in the Banks' BNY accounts. Plaintiffs argue that they are entitled to enforce their judgment against these assets under the TRIA because the Banks' accounts hold "blocked assets" and each of the Banks is an "agency or instrumentality" of Iran. The Banks argue that the assets in their BNY accounts are not "blocked assets" and that, in any event, none of the Banks is an "agency or instrumentality" of Iran under the TRIA. The government supports the Banks' assertion that the Banks' assets in question are not "blocked assets" under the TRIA and, therefore, not subject to attachment under the TRIA.

### A. *Blocked Assets*

The parties do not dispute that the Banks' BNY accounts are covered by the general license authorizing transactions with Iran under IACR § 535.579, as the assets undisputedly came within U.S. jurisdiction after January 19, 1981; and that the accounts are authorized by the specific licenses issued in March 1996. Rather, the parties dispute, *inter alia,* the effect of the general and specific licenses on the status of the assets in the Banks' accounts

for purposes of determining whether they are "blocked assets" under the TRIA.

Plaintiffs argue that all Iranian assets which entered U.S. jurisdiction on or after November 14, 1979 are "blocked assets," and that all Iranian assets "regulated" or "licensed" by the OFAC under the IEEPA are "blocked assets" under the TRIA. In plaintiffs' view, although most Iranian assets blocked in 1979 were returned to Iran following the Algiers Accord in 1981, "all remaining assets and any thereafter that became subject to U.S. jurisdiction continue to be 'blocked.' Iran's use of the assets is regulated and authorized by U.S. treasury license or licenses. The licenses do not eliminate the fact that the assets are blocked, [they] only regulate their use." Plaintiffs–Respondents' Supplemental Memorandum of Law ("Pls.' Supp. Mem."), at 2; *id.* at 8 ("The assets remain blocked, title remains with Iran, but the use of the assets are regulated and authorized by [IACR § 535.579]."); Plaintiffs–Respondents' Memorandum in Reply to the Statement of Interest of the United States ("Pls.' Reply Mem."), at 9 ("[A]ll assets subject to an IEEPA blocking order are 'blocked assets' within the meaning of TRIA, whether licensed or not." (emphasis omitted)). According to plaintiffs, the general license vitiates the "practical effect" of EO 12170 (*i.e.,* the 1979 blocking order) but not the "legal effect" of EO 12170 on the "legal status of Iranian assets in the United States." Pls.' Reply Mem. at 9 (emphasis omitted).

As for plaintiffs' argument that assets "regulated" or "licensed" by the OFAC under the IEEPA are "blocked assets," plaintiffs note that the ITR were promulgated in part under the IEEPA; that the OFAC defines "blocking" as a form of "controlling" assets; and that a "blocked account" is an "account with respect to which payments, transfers, withdrawals or other dealings may not be made except as licensed by OFAC." Plaintiffs–Respondents' Memorandum of Law Pursuant to CPLR § 5239 ("Pls.' Mem."), at 22–23 (quoting U.S. Treasury Dep't. *Foreign Assets Control Regulations for the Financial Community,* at 4 (Dec. 27, 2002)). It follows, plaintiffs reason, that "a 'blocked' account is an account *regulated* by OFAC" with transfers, withdrawals and other dispositions carried out pursuant to an OFAC license. *Id.* at 23 (emphasis in original). According to plaintiffs, the ITR do not have any affect on EO 12170 (the 1979 blocking order) or IACR § 535.579 (the general license), but merely "limit the effect of the general license contained in § 535.579, by creating a new regimen to regulate transactions. The ITR operates in parallel to, and does not in any way effect [sic], the provisions of the IACR." Pls.' Supp. Mem. at 8.

Plaintiffs further claim that their interpretation of the TRIA is supported by FSIA § 1610(f)(1)(A). That provision was added to the FSIA in 1998 to authorize enforcement of a judgment against a terrorist state by attachment or execution of "any property with respect to which financial transactions are prohibited or regulated pursuant to ... sections 202 and 203 of the [IEEPA] ...." 28 U.S.C. § 1610(f)(1)(A). At the same time that provision was added to the FSIA, however, Congress authorized the President to waive the requirements of that provision; and the President immediately issued a waiver on the grounds that the provision "would impede the ability of the President to conduct foreign policy in the interest of national security and would, in particular, impede the effectiveness of such prohibitions and regulations upon financial transactions." *See* Presidential Determination No. 99–1, 63 Fed.Reg. 59201 (Oct. 21, 1998). The President issued a new waiver on October 28, 2000 as part of the "Vic-

tim's of Trafficking and Violence Protection Act of 2000." *See* Presidential Determination No. 2001–03, 65 Fed.Reg. 66483 (Oct. 28, 2000).

Bank Melli argues, *inter alia,* that the blocking prohibition imposed by EO 12170 and IACR § 535.201 was removed on most Iranian assets pursuant to the Algiers Accords and relevant executive orders and OFAC regulations, including IACR § 535.579; that Bank Melli's account was never "blocked" under the IACR because the account was not opened until 1996 and the restrained funds were not placed in the account until November 2002; and that the ITR is not a "blocking program," as is the IACR, and therefore the ITR does not "block" or "freeze" assets.

The government disagrees with plaintiffs' arguments and largely agrees with Bank Melli's arguments. In the government's view, the accounts do not hold "blocked assets" because the accounts were established long after the 1979 blocking order (*i.e.,* EO 12170) and long after the general license in IACR § 535.579 removed the effect of that blocking order on funds entering the Untied States after January 19, 1981; and the regulations under which the Banks operate their representative offices do not freeze or block assets, but expressly authorize the Banks to close the accounts at the request of the account holder. In addition, the government disagrees with plaintiffs' argument that assets "regulated" or "licensed" by the OFAC under the IEEPA are "blocked assets" as that term is clearly defined in the TRIA to mean an asset "seized or frozen."

Bank Saderat also argues that its BNY account does not hold "blocked assets," basing its argument on the grounds that a Senior Compliance Officer with the OFAC, in the *Flatow* case in February 2000, asserted that she was "not aware of any

assets of Bank Saderat Iran in the United States that are currently treated by OFAC as blocked assets under Executive Order No. 12170 (November 14, 1979), or the Iranian Assets Control Regulations, 31 C.F.R. Part 535." Declaration of Lorraine B. Lawlor, Senior Compliance Officer, OFAC, dated February 10, 2000, ¶ 5 (*see* Letter Brief of Steven W. Kerekes, Counsel for Bank Saderat, Exh. A).

Bank Melli further argues that its BNY assets are expressly excluded from the definition of blocked assets by § 201(d)(2)(B)(i) of the TRIA. Section 201(d)(2)(B)(i) provides that the term "blocked assets" does not include property that

> is subject to a license issued by the United States Government for final payment, transfer, or disposition by or to a person subject to the jurisdiction of the United States in connection with a transaction for which the issuance of such license has been specifically required by statute other than the International Emergency Economic Powers Act (50 U.S.C. 1701 *et seq.*) or the United Nations Participation Act of 1945 (22 U.S.C. 287 *et seq.*).

TRIA § 201(d)(2)(B)(i), 116 Stat. at 2339–40. According to Bank Melli, this provision exempts the assets in its BNY account because that account is subject to a specific license issued under not only IEEPA but also ISDCA—a statute "other than" IEEPA. In response, plaintiffs argue that because some licensed assets are excluded by § 201(d)(2)(B)(i) from the definition of "blocked assets," all assets subject to a license under IEEPA—even if subject to a license issued under some other statute— fall outside the exclusion and within the category of "blocked assets." In the government's view, even though Congress excluded certain blocked property that has been licensed for final payment or transfer

under statutes other than IEEPA, that does not mean that all types of licensed property under IEEPA are blocked property. Statement of Interest of the United States ("Gov't's Statement"), at 24.

In determining whether the Banks' assets maintained at DNY are "blocked assets," the Court starts with the language of the statute. *See In re Edelman*, 295 F.3d 171, 177 (2d Cir.2002). As is relevant here, the TRIA defines a "blocked asset" as any asset "seized or frozen" by the United States under IEEPA §§ 202 and 203. Unfortunately, these terms are not further defined in the TRIA. And the terms "seized" and "frozen" do not appear in §§ 202 and 203 of the IEEPA, 50 U.S.C. §§ 1701 and 1702. According to plaintiffs, the Court should therefore resort to the legislative history of the statute for interpretation. In plaintiffs' view, the legislative history of the TRIA demonstrates that the term "blocked assets" under the TRIA is an "omnibus term encompassing all Iranian assets which have been blocked, frozen, seized, restricted or otherwise regulated by any proclamation, order, regulation or license issued pursuant to IEEPA." Pls.' Mem. at 21. In support of this interpretation, plaintiffs refer to, *inter alia*, the following statements by Senator Tom Harkin, a co-author of Title II of the TRIA:

> [T]he term "blocked asset" has been broadly defined to include any asset of a terrorist party that has been seized or frozen by the United States in accordance with law. This definition includes any asset with respect to which financial transactions are prohibited or regulated by the U.S. Treasury under any blocking order under the Trading With the Enemy Act, the International Emergency Economic Powers Act, or any proclamation, order, regulation, or license.

Senate Proceedings and Debates of the 107th Congress, Second Session, 148 Cong. Rec. S11528 (daily ed. Nov. 19, 2002) (statement of Sen. Harkin).

Upon consideration, the Court rejects plaintiffs' arguments that all Iranian assets which entered U.S. jurisdiction after the 1979 blocking order, *i.e.*, EO 12170, are "blocked assets" within the meaning of the TRIA, and that the term "blocked assets" includes all assets "regulated" or "licensed" under IEEPA by OFAC. Although, as the parties agree, EO 12170 has not been revoked, the blocking prohibition imposed by that order was removed on most Iranian assets pursuant to the Algiers Accords and relevant executive orders and OFAC regulations, including IACR § 535.579, which removed the blocking prohibition on property entering into U.S. jurisdiction after January 19, 1981. Contrary to plaintiffs' argument that the general license merely authorized the use of such assets but did not change the status of those assets, § 535.502(c) specifically provides that the license "has the effect of removing a prohibition," *i.e.*, the blocking prohibition. *See* IACR § 535.502(c) (providing that a "license authorizing a transaction otherwise prohibited under this part has the effect of removing a prohibition or prohibitions in Subpart B from the transaction"). Thus, assets subject to the general license that entered into U.S. jurisdiction after January 19, 1981 are not necessarily "blocked." Indeed, as the government points out, the general license allows the Banks to close their accounts and remove the assets from U.S. jurisdiction, *see* 31 C.F.R. § 560.517(a)(3).

Moreover, the Court does not agree with plaintiffs that the term "blocked assets," as defined, must be construed as an "omnibus" term extending to all assets "regulated" or "licensed" by the OFAC under the

IEEPA. Plaintiffs' interpretation of "blocked assets" ignores the limitation imposed by the definition itself. The TRIA limits the definition of "blocked assets" to those that are "seized or frozen" by the United States under specified statutes, one of which is the IEEPA. The IEEPA authorizes the president to take various actions regarding property in which a foreign country or person has an interest, including "investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit." *See* 50 U.S.C. § 1702(a)(1)(B). Even before the phrase "block during the pendency of an investigation" was added to the IEEPA in the USA Patriot Act,[6] the Supreme Court recognized that the President has the authority to issue blocking orders under the IEEPA. *See Dames & Moore v. Regan*, 453 U.S. 654, 673, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981); *Smith v. Federal Reserve Bank of New York*, 346 F.3d 264, 268 n. 2 (2d Cir.2003). Nevertheless, the term "block" is not defined; nor are the terms "seize" or "freeze." "Blocking" is defined, however, by OFAC as a "freezing" of assets that imposes an "across-the-board prohibition against transfers or transactions of any kind with regard to the property." U.S. Treasury Dep't, *Foreign Assets Control Regulations for the Financial Community*, at 4 (Dec. 27, 2002). And while neither the parties nor the government point to an OFAC definition of the term "seize," the Second Circuit, in construing the TRIA, recently observed that "[t]o seize or freeze assets transfers *possessory* interest in the property." *Smith*, 346 F.3d at 272 (emphasis in original). Similarly, as used in the law, the word "seize," in relevant context, means "to forcibly take possession of … property." Black's Law Dictionary 1363 (7th ed.1999). Given that not every type

of action authorized by the IEEPA necessarily involves a seizing or freezing of property, it follows that not every action regarding property under the authority of the IEEPA, including assets that may be "regulated" or "licensed," results in the property being "blocked" under the TRIA. As noted, the term "blocked" under the TRIA is specifically limited to assets that are "seized or frozen"—a limitation that this Court cannot ignore. *Cf. Smith*, 346 F.3d at 271–72 (concluding that "the term 'blocked assets' reaches broadly to include any property seized or frozen by the United States. But it does not reach so broadly as to encompass confiscated property. To seize or freeze assets transfers *possessory* interest in the property. But confiscation, pursuant to IEEPA § 203(a)(1)(C) [*i.e.,* 50 U.S.C. § 1702(a)(1)(C) ], transfers *ownership* of terrorist property by vesting right, title, and interest as the President deems appropriate." (citation omitted)).

Furthermore, plaintiffs' reliance on FSIA § 1610(f)(1)(A) is misplaced, as that provision contains a notably different definition of attachable assets than specified in the TRIA. That provision, unlike the TRIA provision, clearly authorizes attachment or execution of property "regulated" under the IEEPA.

Moreover, although, as plaintiffs assert, there is legislative history to the TRIA indicating that the term "blocked asset" includes any asset "regulated" by the Treasury Department, the seemingly clear statutory text does not reasonably allow that broader interpretation, nor compel resort to legislative history for interpretation. *See West Virginia Univ. Hosps. Inc. v. Casey*, 499 U.S. 83, 98, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991); *In re Edelman*, 295 F.3d at 177.

6. *See* Pub. L No. 107–56, § 106, 115 Stat. 272, 277 (Oct. 26, 2001).

Consequently, the Court also rejects plaintiffs' interpretation of the § 201(d)(2)(B)(i) exception, as that interpretation would necessarily require a broader definition of "blocked asset" than is provided. There is no indication in the TRIA, as the government argues, that this exception sweeps into the definition of "blocked assets" all licensed transactions, even as to property that has never been "seized or frozen."

Plaintiffs have advised the Court that the Senate recently passed a proposed amendment to the TRIA on July 11, 2003, entitled "Clarification of Blocked Assets for Purposes of Terrorism Risk Insurance Act of 2002," 149 Cong. Rec. S9256. *See* Letter from Jeffrey A. Miller, Esq., Counsel for Plaintiffs, dated July 30, 2003. Under the proposed amendment, "blocked asset" is defined to further include "any asset or property that in any respect is subject to any prohibition, restriction, regulation or license pursuant to chapter V of title 31, Code of Federal Regulations (including parts 515, 535, 550, 560, 575, 595, 596, and 597 of such title), or any other asset or property of a terrorist party." According to plaintiffs, this amendment "clarifies" the existing meaning of the term "blocked asset." In response, Bank Melli disputes the significance of the proposed amendment, arguing, *inter alia,* that the proposal, in fact, recognizes that the current definition does not equate "regulated" assets with "blocked assets," and urging the Court to decide the matter based on the law as it presently exists, not a proposal. *See* Letter from John D. Winter, Esq., Counsel for Bank Melli, dated August 4, 2003.

Despite plaintiffs' arguments, this proposed amendment would add to, not mere-

ly clarify, the current definition, as it would significantly alter the limiting language in the present law. Moreover, as Bank Melli urges, the Court is obliged to decide this matter on the law as it presently exists, not upon a proposed amendment. *See Plaut v. Spendthrift Farm, Inc.,* 514 U.S. 211, 227, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1985); *Walsche v. First Investors Corp.,* 981 F.2d 649, 653 (2d Cir.1992).

### B. *Agency or Instrumentality*

Given the Court's conclusion that the Banks' assets at issue are not "blocked assets" under the TRIA, the Court need not determine whether the Banks are "agencies or instrumentalities" for purposes of attachment under the TRIA.[7]

### III. *CONCLUSION*

For the above reasons, the Court concludes that the Banks' assets in their BNY accounts are not subject to attachment under the TRIA. The Court will contact the parties regarding submission of an appropriate order, including a provision for a stay pending any appeal.

SO ORDERED.

---

**7.** In addition, given the Court's determination that the Banks' assets at issue are not subject to attachment under the TRIA, the Court need not reach Bank Melli's additional argument that the second restraining notice is void because it was served without court order.