MANION, Circuit Judge,
concurring in part and dissenting in part.
I agree with the court that the insurance companies have standing. However, I disagree with the court’s conclusion that the forfeiture license and the in rem arrest warrants prevent the insurance companies from recovering the funds. Neither the forfeiture license nor the arrest warrants changed the status of the funds as blocked under the Terrorism Risk Insurance Act (“TRIA”), and the funds remain accessible by the insurance companies. For these reasons, I respectfully dissent.
I. Blocked funds and TRIA.
The International Emergency Economic Powers Act (“IEEPA”) gives the President the power to block, i.e., freeze, assets in response to “any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States.” 50 U.S.C. §§ 1701(a), 1702(a)(1)(B); see also Smith v. Fed. Reserve Bank of N.Y., 346 F.3d 264, 267 (2d Cir.2003). The United Nations Participation Act (“UNPA”) empowers the President to apply measures to enforce economic -and communication sanctions called for by the United Nations Security Council. 22 U.S.C. § 287c. After the terrorist attacks of September 11, 2001, the President invoked these powers to issue Executive Order 13224 to block the assets of designated terrorists, terrorist organizations, and foreign persons who support these terrorists. 66 Fed.Reg. 49079-83 (Sept. 25, 2001). The Department of the Treasury’s Office of Foreign Assets Control (“OFAC”) promulgated the Global Terrorism Sanctions Regulations (“GTSR”) to implement Executive Order 13224. 68 Fed.Reg. 34196-97 (June 6, 2003). “Except as authorized by statutes, regulations, orders, directives, rulings, instructions, licenses or otherwise,” funds that are blocked under GTSR “may not be transferred, paid, exported, withdrawn or otherwise dealt in.” 31 C.F.R. § 594.201(a).
“To ensure the continued financial capacity of insurers to provide coverage for risks from terrorism,” Congress passed *628 the Terrorism Risk Insurance Act (“TRIA”). Pub.L. No. 107-297, 116 Stat. 2322 (Nov. 26, 2002). In addition to a general terrorism insurance program, TRIA gives victims of terrorism the ability to execute judgments on terrorist assets that are blocked (i.e., “seized or frozen”) under IEEPA. § 201(a), 116 Stat. at 2337. The question before the court is whether the funds are considered blocked under TRIA. If the funds are blocked, they are available to satisfy the insurance companies’ judgments. If the funds are instead considered “unblocked” under TRIA, they are no longer available to satisfy judgments.
The parties stipulated that OFAC blocked the funds on June 18, 2007, pursuant to Executive Order 13224, IEEPA, and GTSR. Gov’t App’x L.A. 272, 18. This action by OFAC brought the funds within the ambit of TRIA and made them eligible to satisfy the judgments of the insurance companies. However, the parties also stipulated that OFAC issued a license to the DOJ on July 8, 2011 to “take all necessary actions in furtherance of the ... pursuit of [the] civil forfeiture of the [defendant funds].” Id. at 20. The license allowed the government to move forward with its complaint for civil forfeiture, which it filed on June 19, 2011. In furtherance of the forfeiture action, the district court issued in rem arrest warrants for the funds on July 12, 2011. The district court took possession of the funds on July 14, 2011. Gov’t App’x L.A. 15. So, the more specific question is whether the forfeiture license or arrest warrants changed the status of the funds under TRIA from blocked to unblocked. As explained below, neither the forfeiture license nor the arrest warrants unblocked the funds under TRIA.
II. The effect of the license.
As mentioned, the parties stipulated that OFAC blocked the funds pursuant to GTSR, 31 C.F.R. § 594.101, et seq. Those regulations contain the following provisions:
No regulation, ruling, instruction, or license authorizes any transaction prohibited under this part unless the regulation, ruling, instruction, or license is issued by [OFAC] and specifically refers to this part. No regulation, ruling, instruction, or license referring to this part shall be deemed to authorize any transaction prohibited by any provision of this chapter unless the regulation, ruling, instruction, or license specifically refers to such provision.
31 C.F.R. § 594.502(b). To put it another way, if OFAC blocked the assets under GTSR, then OFAC can unblock the assets by a license only if the license specifically refers to GTSR and the specific provision used to block the assets. The limitation is more than a simple requirement to reference the provision that originally blocked the assets:
No license or authorization contained in or issued pursuant to those other parts [of the OFAC chapter] authorizes any transaction prohibited by this part. No license or authorization contained in or issued pursuant to any other provision of law or. regulation authorizes any transaction prohibited by this part.
31 C.F.R. § 594.101. Therefore, if OFAC blocked the assets under GTSR, then OFAC can unblock the assets by a license only if the license is issued under GTSR. For this reason, the forfeiture license must have been issued pursuant to GTSR if it was a valid license. Furthermore, a valid license issued under GTSR is construed narrowly:
Any regulation, ruling, instruction, or license authorizing any transaction otherwise prohibited under this part has *629 the effect of removing a prohibition contained in this part from the transaction, but only to the extent specifically stated by its terms.
81 C.F.R. § 594.502(c) (emphasis added).
Thus, the forfeiture license permitted the DOJ to “take all necessary actions in furtherance of the ... pursuit of [the] civil forfeiture of the [defendant funds]” and nothing more. Gov’t App’x L.A. 272, 20. So, although .the license unblocked the funds so that the government could obtain arrest warrants in furtherance of its civil forfeiture action, the license did not unblock the funds for the terrorist Muhammad Abdallah Abdan Al Ghamdi (“al Tayyeb”) or anyone else. Clearly, if the government fails in its civil forfeiture action, the funds are not then available to al Tayyeb. In short, the funds are still blocked for all other purposes. The government concedes this fact. See Gov’t Reply Br. 18 (“The government, however, has not argued that OFAC issued a general license completely lifting the order it imposed in 2007. Rather, OFAC allowed the government to take all necessary action to subject the defendant funds to forfeiture.”). The license, by its terms, did not unblock the funds for the purposes of TRIA.[1]
There is, though, a way in which a license can unblock funds for purposes of TRIA without unblocking the funds under GTSR. It involves TRIA’s definition of blocked assets but, as explained below, it does not apply here.[2]
III. The TRIA license exclusion.
TRIA excludes from its definition of blocked assets property that is subject to a license that meets four specific criteria: the license must be 1) issued by the United States Government; 2) for final payment, transfer, or disposition; 3) for a transaction by or to a person subject to the jurisdiction of the United States; and 4) specifically required by a statute other than IEEPA or UNPA. § 201(d)(2)(B)(i), 116 Stat. at 2339-40 (emphasis added). Assets subject to a license that meets the above criteria are considered “unblocked” for the purposes of TRIA even though they are still blocked for other purposes (except, of course, for whatever purpose is authorized by the license). There is no dispute that the forfeiture license was issued by the United States and involves a person subject to the jurisdiction of the United States. So, of the four criteria, only the second and fourth remain for the court to decide. If the license is either not for final payment, transfer, or disposition or if the license is required by either the IEEPA or UNPA, then the funds are still eligible to satisfy the insurance companies’ judgment. Of course, had the government disclosed the forfeiture license we might easily discern the answer. But since the government has not disclosed it, further analysis is necessary.

*630
A. The stipulated language is insufficient to conclude that the license is for final disposition.

The stipulated language is too vague to establish that the forfeiture license is a license for final disposition. True, the award of the funds to the government according to a final judgment of forfeiture would be a final disposition. And, it is conceivable that a license could authorize the government to take title to the funds only if and when the district court enters final judgment in the government’s favor. But, the stipulated language does not say these things. The stipulated language says only that the license authorizes the DOJ to “take all necessary actions in furtherance of the ... pursuit of [the] civil forfeiture.” Gov’t App’x L.A. 272, 20. Before the court holds that the license is for final disposition, it should consider what the original language of the license might say. What is underneath the ellipsis? Does the addition of the second “the” change the original meaning? Could it be that OFAC authorized the DOJ to take all necessary actions in furtherance of the filing of a complaint in pursuit of civil forfeiture? Or, perhaps OFAC authorized the DOJ to take all necessary actions in furtherance of the restraining orders required for the pursuit of civil forfeiture? Until the government discloses the forfeiture license we will not know.

B. The license was required by IEE-PA and UNPA.

Even if the forfeiture license were a license for final disposition, the assets are not excluded from TRIA’s definition of blocked assets because the license does not meet the fourth requirement that the license be required by a statute .other than the IEEPA or UNPA. As explained previously, the forfeiture license must have been issued under GTSR in order to constitute a valid license. Supra at 628. An examination of GTSR’s authority reveals that its substantive authority (i.e., its authority for blocking and licensing) is derived from IEEPA and UNPA. See 31 C.F.R. § 594.101, Statutory Authority (authority note applicable to entire part); see also 68 Fed.Reg. 34196-97. Hence, any license issued under GTSR is issued under IEEPA and UNPA, and any license required by GTSR is required by IEEPA and UNPA.
It follows that the forfeiture license cannot meet the requirements of TRIA’s exclusion: To be a valid license, OFAC must have issued the forfeiture license under GTSR and, consequently, under IEEPA and UNPA. If so, then the license was not issued “in connection with a transaction for which the issuance of such license has been specifically required by statute other than [IEEPA] or [UNPA]” as required by TRIA’s exclusion. § 201(d)(2)(B)(i), 116 Stat. at 2339-40 (emphasis added). If, on the other hand, OFAC did not issue the forfeiture license under GTSR, then it is not a valid license at all and the funds are not “subject to a license” as required by TRIA’s exclusion. Id. at 2339. In either of the only two possible cases (issued under GTSR or not) the license does not satisfy the requirements of TRIA’s exclusion. Consequently, the funds are not considered unblocked by TRIA’s exclusion.
IV. United States v. Holy Land.
The government invites us to rely on the Fifth Circuit’s decision in United States v. Holy Land Found, for Relief and Dev., 722 F.3d 677 (5th Cir.2013), to hold that since the license unblocked the funds for the purposes of the forfeiture proceeding, thereby making them available to any qualified claimant, the funds are no longer blocked under TRIA.[3] The Fifth Circuit, *631 however, did not hold that the OFAC license in its case unblocked the assets. Rather, it held that “the government essentially unblocked HLF’s assets when it obtained a restraining order under 21 U.S.C. § 853(e)(1)(A) to pursue the criminal forfeiture of those assets.” Id. at 685.
The license in Holy Land stated that it “authorized the government ‘to pursue criminal forfeiture of the assets of the Holy Land Foundation for Relief and Development (“HLF”) blocked pursuant to’ Executive Orders 12947 and 13224” and “further authorized the government to pursue ‘restraining orders’ in order to preserve the assets for criminal forfeiture.” Id. at 687. The plaintiffs in Holy Land could not satisfy their judgment because “[o]nce an indictment had been filed and the assets restrained, victims of terrorism could no longer execute against those assets ... TRIA could not be applied to those funds since they no longer qualified as blocked under that statute.” Id. (citations omitted).
The reason given by the Fifth Circuit for this result was twofold: First, “TRIA specifically limits the definition of ‘blocked’ assets to those that are seized or frozen under ... the Trading with the Enemy Act or ... IEEPA.” Id. at 685. And, second, TRIA “does [not] reach those funds which the government has been given authorization to control through another means.” Id. In other words, because the government was given authorization to control the funds in Holy Land through the restraining orders, the Fifth Circuit held that the funds were no longer blocked under IEEPA.[4] And, since the funds were no longer blocked under IEEPA, they were no longer reachable by TRIA.
The Fifth Circuit’s conclusion is wrong, and the reason why should be obvious from the discussion above. The forfeiture license in Holy Land never unblocked the funds under IEEPA. Rather, despite the fact that the funds were still blocked under IEEPA the license allowed the forfeiture action to proceed. The Fifth Circuit stated this exactly, but did not recognize the inconsistency: “Notwithstanding the status of HLF’s assets as blocked, the government’s receipt of a .license from OFAC restrained those assets and permitted the government to proceed with the criminal forfeiture process.” Id. at 687 (emphasis added). Similarly here, as the government concedes, OFAC did not issue a license completely lifting its blocking order imposed in 2007. Instead, it issued a specific license allowing for the government’s forfeiture action and nothing more. Therefore, Holy Land provides no reason to hold that the license or the arrest warrants unblocked the funds.
Another reason not to accept the Fifth Circuit’s conclusion is that it provided no authority for its premise that TRIA cannot reach those funds which the government has been given authorization to control through other means. The Fifth Circuit did cite the D.C. District Court and Second Circuit as authorities which — the Fifth Circuit thought — have decided that assets subject to licenses are unblocked under TRIA. Id. (citing Estate of Heiser v. Islamic Republic of Iran, 807 F.Supp.2d 9, 18 n. 6 (D.D.C.2011), and Bank of N.Y. v. Rubin, 484 F.3d 149, 150 (2d Cir.2007)). An examination of both cases, however, reveals that they were not decided as the Fifth Circuit understood.
*632 In Estate of Heiser, the plaintiffs sued the Telecommunications Company of Iran under the Foreign Sovereign Immunities Act (“FSIA”) in order to attach payments owed to the telecommunications company. Estate of Heiser, 807 F.Supp.2d at 16-18. The plaintiffs chose not to sue under TRIA because of the paucity of blocked Iranian assets available for attachment. Id. at 15. They chose instead to sue under the FSIA because it allows plaintiffs to attach the property of state agencies or instrumentalities when they cannot attach the property of the state itself. Id. at 15-16, 18. Since OF AC’s Iranian Transactions Regulations contained a general license that “unblocked” payments to telecommunication companies that handled traffic between the United States and Iran, the plaintiffs attempted to attach payments owed by Sprint to the Telecommunications Company of Iran. Id. at 16-17. In a footnote, the district court noted:
Here, the payments owed from Sprint to [sic] TIC are neither seized nor frozen; instead, they are made under a general license permitting payments incident to telecommunications traffic----Thus, because transactions between Sprint and [sic] TIC are undertaken under an OFAC licensing scheme, they are unblocked and not subject to attachment.
Id. at 18 n. 6. The Fifth Circuit misunderstood this discussion to mean that the district court held that blocked assets subject to a license (such as we have here) are unblocked. That is not what the district court said. Rather, the district court explained that the payments between the telecommunication companies were never blocked because the OFAC general license removed all such transactions from the sanction regulations’ prohibitions. Since the payments were never blocked to begin with, TRIA was inapplicable.
This is why the distinction between general and specific licenses is important. GTSR defines a general license as “any license or authorization the terms of which are set forth in subpart E of this part” and a specific license as “any license or authorization not set forth in subpart E of this part but issued pursuant to this part.”[5] 31 C.F.R. § 594.307. Subpart E of the GTSR contains regulations that authorize specific types of transactions. See, e.g., 31 C.F.R. § 594.517 (“receipts of payment of professional fees and reimbursement of incurred expenses for the provision of legal services authorized pursuant to § 594.506(a) are authorized from funds originating outside the United States”). A general license, then, is not so much a license as a regulation preventing assets from being blocked in the first place. In contrast, a specific license is a license issued under the authority of the regulations that is necessary to unblock assets that the regulations have at first blocked. In this case we are dealing with a specific license that unblocked the funds for the purposes of forfeiture.
The second case relied upon by Holy Land made the same distinction. In Bank of N.Y., the Second Circuit adopted the reasons of the “fine opinion below” and stated:
[W]e hold that assets blocked pursuant to Executive Order 12170, 44 Fed.Reg. 65,729 (Nov. 14, 1979), and its accompanying regulations, see 31 C.F.R. Part 535, that are also subject to the general license of 31 C.F.R. § 535.579, are not blocked assets under the TRIA and therefore are not subject to attachment under that statute.
Bank of N.Y., 484 F.3d at 150. Below, the district court explained: “This license [31 C.F.R. § 535.579(a) ] has the effect of re *633 moving a prohibition or prohibitions in subpart B from the transaction.... Accordingly, transactions authorized by the general license would not be blocked by Section 535.201.” Bank of N.Y. v. Rubin, 2006 WL 633315 at *3, 2006 U.S. Dist. LEXIS 10215 at *9 (S.D.N.Y. Mar. 15, 2006) (quotation omitted). The license at issue in Bank of N.Y. was not a specific license of the type at issue here or in Holy Land, but a regulation put in place to effectuate the “Algiers Accords” where “most Iranian assets in the United States were unblocked and the trade embargo was lifted.” Id. at *3, 2006 U.S. Dist. LEXIS 10215 at *8. Therefore, as with Estate of Heiser, Bank of N.Y. concerns a general license that is really a regulation that removes the prohibition from the law, not a specific license that unblocks assets for a specific purpose that were blocked by an OFAC order. Thus, it stands that assets subject to a general license are not blocked for the purposes of TRIA because a general license is a regulation that removes the prohibition against the assets so that the sanction regulations do not block the assets in the first place. See Weinstein v. Islamic Republic of Iran, 299 F.Supp.2d 63, 67-68 (E.D.N.Y.2004). That is not the case here.
V. Conclusion.
For the reasons explained above, neither the forfeiture license nor the arrest warrants in this case unblocked the funds for the purpose of TRIA. Consequently, the funds are still blocked and available to satisfy the insurance companies’ judgment. To hold otherwise would render meaningless our opinion that TRIA’s “notwithstanding” clause supersedes civil forfeiture standing requirements. We are compelled to hold that TRIA supersedes civil forfeiture standing requirements because “once the United States commences a forfeiture action, it is impossible for qualified albeit unrelated victims of terror (here, the insurance companies) to comply with civil forfeiture’s innocent owner requirement and, at the same time, execute against the blocked funds.” Ante at 620. Yet, as the government explains, “To secure the in rem jurisdiction, the district court was required to arrest or judicially restrain the defendant funds.” Gov’t Reply Br. 26 n.23 (citing United States v. All Funds Distributed To Weiss, 345 F.3d 49, 55 (2d Cir.2003) (possession or restraint of the defendant. res is necessary for the district court to secure its in rem jurisdiction.)).[6] If an OFAC forfeiture license with an arrest warrant or restraining order unblocks blocked assets, plaintiffs who are “allowed to enter the courthouse” through TRIA’s “notwithstanding” clause will never obtain relief since every forfeiture action against blocked funds requires an OFAC license and an arrest warrant or restraining order.
Finally, since neither the license nor the arrest warrants unblock the funds under TRIA, it is necessary to address the government’s sovereign immunity argument. The government argues that the insurance companies cannot attach the funds because TRIA does not waive the government’s sovereign immunity. The district court, however, correctly found that Congress had waived the government’s sovereign immunity through TRIA. We should adopt the district court’s reasoning and reach the same conclusion. See United States v. All Funds on Deposit with R.J. O’Brien & Assocs., 892 F.Supp.2d 1038, 1043-45 (N.D.Ill.2012).
All that said, perhaps what is most troubling about this case is that the Executive Branch has dictated the pace of this proceeding at every turn and continually *634 stonewalled the insurance companies’ efforts to satisfy their judgment against terrorist assets. The funds, were blocked by the government from 2007 to 2011. After ignoring FOIA requests from the insurance companies for years on the grounds that they were exempt from disclosure for reasons of national security, the government finally disclosed the identity of the blocked assets when, in June 2011, the government initiated a forfeiture proceeding against them.[7] In August 2011, the insurance companies timely asserted their interests. The government resisted, but lost in the district court. Now, on appeal, the government argues that its acquisition of a forfeiture license unblocked the assets, and because the assets are unblocked they are no longer within the ambit of TRIA. Because the court accepts this argument, the insurance companies are out of luck, and the assets will be forfeited to the government without ever seeing the light of day. The government accomplishes this coup d’état despite the fact that the forfeiture license that is the lynchpin of its theory is not in the record, so we do not have the complete picture of its contents. Perhaps that is why the government used the coup de main of stipulating to a vague description of the unseen forfeiture license.
For these reasons, I would affirm the judgment of the district court.

. As a general matter, even though TRIA is dependent on IEEPA and regulations like GTSR to block funds, its mechanisms for attachment operate outside of those laws. See Estate of Heiser v. Bank of Tokyo Mitsubishi UFJ, 919 F.Supp.2d 411, 422-23 (S.D.N.Y.2013) (accepting representations by the United States that an OFAC license is not required to authorize the release of blocked assets subject to TRIA).

. Although the parties did not argue this issue with specificity on appeal, they raised the overarching issue of whether the forfeiture license unblocked the funds under TRIA. An examination of that issue requires an examination of TRIA’s definition of blocked assets. Therefore, the issue is not waived.

. From all indications, it appears that the Fifth Circuit in Holy Land had the benefit of a *631 copy of the forfeiture license in the record, a benefit not provided by the government in this case.

. The assets in Holy Land were blocked under IEEPA, not the Trading With the Enemy Act. Holy Land, 722 F.3d at 685.

. Each part of the OFAC regulations contains its own definitions so it is necessary to examine the definitions specific to the sanction regime at issue. See 31 C.F.R. § 501.301.

. An examination of Rule G(3)(b) of the Supplemental Rules of Admiralty or Maritime Claims and Asset Forfeiture also reveals this to be the case.

. In July 2003, the insurance companies sent FOIA requests to relevant federal agencies including the Treasury Department and the DOJ seeking "identification of assets belonging to” al Qaeda and approximately 192 other Executive Order 13224 terrorist designees. In 2005, the insurance companies brought suit to obtain this information. In October 2006, Treasury asserted that information was exempt from disclosure. In June 2008, the insurance companies submitted an amended FOIA request for "any and all documents from the DOJ’s Criminal Division identifying assets belonging to the foreign states, terrorism-related entities and individuals....” In October, 2008, the DOJ-Criminal Division responded that "as of August 5, 2008, the AFMLS has reported that they do not have any records of assets pertaining to the individuals and entities named in your request.” In December 2008, the government prevailed in the FOIA suit.